## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**LEGACY ENTERTAINMENT & ARTS FOUNDATION, INC., FICTITIOUS PLAINTIFF 1, LAWANNA GELZER, BLACK LIVES MATTER TAMPA, LLC and COMMUNITY EMPOWERMENT PROJECT, INC.,**

   **Plaintiffs,**

v.              Case No: 6:21-cv-698-PGB-DCI

**JOHN WILLIAM MINA, RONALD DION DESANTIS and ASHLEY BROOKE MOODY,**

   **Defendants.**

### ORDER

This cause comes before the Court on Defendants John Mina, Ashley Moody, and Ronald DeSantis's (collectively, "**Defendants**") respective Motions to Dismiss (the "**Motions**" (Docs. 25, 32, 33)). Plaintiffs responded in opposition. (Doc. 41). The Motions are due to be granted.

### I. BACKGROUND

On April 19, 2021, Governor DeSantis signed the "Combatting Public Disorder Act" (the "**Act**" or "**Statute**") into law, and it took effect immediately. (Doc. 5, ¶ 15). The Act amended the Florida Statutes and, in pertinent part, codified definitions for rioting, aggravated rioting, and inciting a riot:

> (2) A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in: (a) Injury to another person; (b) Damage to property; or (c) Imminent danger of injury to another person or damage to property. . .
>
> (3) A person commits aggravated rioting if, in the course of committing a riot, he or she: (a) Participates with 25 or more other persons; (b) Causes great bodily harm to a person not participating in the riot; (c) Causes property damage in excess of $5,000; (d) Displays, uses, threatens to use, or attempts to use a deadly weapon; or (e) By force, or threat of force, endangers the safe movement of a vehicle traveling on a public street, highway, or road. . .
>
> (4) A person commits inciting a riot if he or she willfully incites another person to participate in a riot, resulting in a riot or imminent danger of a riot. . .
>
> (7) This section does not prohibit constitutionally protected activity such as a peaceful protest.

FLA. STAT. § 870.01.

Plaintiffs are three nonprofit organizations and an individual who planned to hold "peaceful[1] demonstrations honoring George Floyd and other victims of racism and police brutality." (*Id.* ¶¶ 29–30) The demonstrations were scheduled for April 24 and May 15, 2021 (*Id.*). Plaintiffs do not allege that either protest was canceled or that they refrained from any activity because of the Act. (*See* Doc. 5).

Plaintiffs initiated this action on April 21, 2021. (Doc. 1).[2] Their Amended Complaint alleges that the Act is "unconstitutional facially and as-applied to the planned, peaceful speech and expressive conduct of Plaintiffs, and any other

---

[1] Plaintiffs repeatedly emphasize the peaceful nature of their demonstrations throughout the Amended Complaint. (*See* Doc. 5, ¶¶ 3, 29, 30, 35–39, 41–42, 47).

[2] Plaintiffs filed an Amended Complaint on April 30, 2021. (Doc. 5).

2

persons subject to these laws." (Doc. 5, ¶ 55). Specifically, Plaintiffs argue that the Act targets protected speech under the First Amendment, employs vague and overbroad definitions, and retaliates against protesters through excessive bail and fines. (*Id.* ¶¶ 6, 22–23). Plaintiffs further allege that they fear prosecution and imposition of civil liability under the Act—notwithstanding their intent to protest peacefully. (*Id.* ¶ 38, 40).

Defendants now move to dismiss. (Docs. 25, 32, 33).

## II. STANDARD OF REVIEW

Under Article III of the United States Constitution, federal judicial power is limited to the resolution of "cases" or "controversies." U.S. CONST. art. III, § 2. Thus, "[l]itigants must show that their claim presents the court with a case or controversy under the Constitution and meets the 'irreducible constitutional minimum of standing.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323 (11th Cir. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Courts must ensure that Article III standing exists "at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

The plaintiff bears the burden of proving standing, which requires a three-part showing: (1) the plaintiff must have suffered an injury-in-fact; (2) the plaintiff's injury must be fairly traceable to the actions of the defendant; and (3) the relief requested must redress the plaintiff's injury. *Allen v. Wright*, 468 U.S. 737, 751 (1984) (reviewing the Supreme Court's standing jurisprudence),

3

*abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S 118 (2014).

To establish injury-in-fact, the plaintiff must demonstrate that he holds "a legally cognizable interest that has been or is imminently at risk of being invaded." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010). At the pleading stage, this requirement is not particularly onerous and will be satisfied by "general factual allegations of injury resulting from [Defendant's] conduct." *Lujan*, 504 U.S. at 561. However, such injury must be "*certainly impending* to constitute injury in fact" and "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

"The injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). "[Courts] will not force a plaintiff to choose between intentionally violating a law to gain access to judicial review and foregoing what he or she believes to be constitutionally protected activity in order to avoid criminal prosecution." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000). "But even in a First Amendment context the injury to the plaintiff requirement cannot be ignored." *Hallandale*, 922 F.2d at 760.

4

## III. DISCUSSION

Defendants challenge Plaintiffs' ability to satisfy each prong of the standing test. The Court finds that Plaintiffs fail to demonstrate an injury-in-fact, so the Amended Complaint is due to be dismissed.[3]

Plaintiffs do not allege that the Act has already been applied against them, but rather argue that the Act "creates a perpetual threat of liability." (Doc. 5, p. 28). Threatened enforcement of a statute can create an Article III standing. *See Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014). "[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). In such cases, the injury is self-censorship. *See ACLU v. The Fla. Bar,* 999 F.2d 1486, 1492 (11th Cir. 1993).

That said, the threat of enforcement must be "sufficiently imminent." *Susan B. Anthony List*, 573 U.S. at 158. "[P]ersons having no fears of state prosecution[,] except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 (1971). "A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson*, 132 F.3d at 1428; *see also Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate

---

[3]   The Court need not consider the other two prongs.

5

substitute for a claim of specific present objective harm or a threat of specific future harm.").

Thus, "[i]n order for a plaintiff alleging that his speech was chilled to have standing, he or she must show that either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Pittman v. Cole*, 267 F.3d 1269, 1283–84 (11th Cir. 2001); *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298–99 ("When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court.").

The most recent Supreme Court case on the issue is *Susan B. Anthony List v. Dreihaus*. The Court found a credible threat of enforcement after considering: (1) whether the petitioners intended to engage in a course of conduct arguably affected with a constitutional interest; (2) whether the petitioners' conduct was "arguably. . . proscribed by [the] statute" they wished to challenge; and (3) whether there was a threat of future enforcement. 573 U.S. at 161—64. To better understand the contours of the *Susan B. Anthony List* standard, it is instructive to review the cases relied upon by the Court to reach its holding.[4]

First, in *Steffel v. Thompson*, a police officer threatened to arrest the petitioner and a companion for criminal trespass while they were distributing

---

[4] In each of these cases, the Court relied on the same three factors to evaluate the credibility of an enforcement threat. However, because these cases precede *Susan B. Anthony List*, they do not apply the three-factor inquiry quite as neatly.

6

handbills protesting the Vietnam War. 415 U.S. 452, 455 (1974). The petitioner left the scene to avoid arrest while his companion remained and was arrested for trespass. *Id.* at 455–56. The petitioner challenged the statute and, importantly, alleged that he "desired to return to the shopping center to distribute handbills, [but] he had not done so because of his concern that he, too, would be arrested." *Id.*

The *Steffel* Court ruled that the petitioner alleged a credible threat of enforcement because: (1) he alleged that he intended to continue handbilling—an activity he argued was constitutionally protected; (2) his desired activity was arguably proscribed by the criminal trespass statute he sought to challenge; and (3) his companion's prosecution showed that his "concern with arrest" was not "chimerical." *Id.* at 459.

Next, in *Babbitt v. United Farm Workers*, the challenged statute made it an unfair labor practice to encourage consumer boycotts "by the use of dishonest, untruthful and deceptive publicity." 442 U.S. at 301. The law also allowed criminal penalties for "[a]ny person . . . who violates any provision [of the statute]." *Id.* at 302. Therefore, the appellees argued that the law unconstitutionally "penalize[d] inaccuracies inadvertently uttered in the course of consumer appeals." *Id.*

The *Babbitt* Court found pre-enforcement standing because: (1) the appellees intended to continue engaging in consumer publicity campaigns—and argued that this was constitutionally protected speech; (2) "erroneous statement[s] [are] inevitable in free debate"; and (3) "the State ha[d] not disavowed any

7

intention of invoking the criminal penalty against unions." *Id.* at 301–03. Therefore, the Court held that "the positions of the parties [were] sufficiently adverse with respect to the consumer publicity provision proscribing misrepresentations to present a case or controversy within the jurisdiction of the District Court." *Id.* at 302.

The Court found standing again in *Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383 (1988). There, several booksellers' organizations challenged a statute making it unlawful to "knowingly display for commercial purpose in a manner whereby juveniles may examine and peruse visual or written material that depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles." *Id.* at 386 (internal quotations omitted). The plaintiffs produced sixteen general-subject books that they believed would violate the statute if it was enforced. *Id.* at 390–91.

The *Booksellers* Court was "not troubled by the pre-enforcement nature of the suit" because: (1) the plaintiffs either lost the right to display the books or would have faced criminal prosecution, and further, their customers would have been forced to "refrain from constitutionally protected speech or expression;"[5] (2) the plaintiffs were able to present specific books that fell within the ambit of the statute; and (3) "the State did not suggest that the statute would not be enforced. . 

---

[5]  The Court noted the special First Amendment rule that allows a plaintiff to challenge a law on behalf of third parties where the existence of the statute may cause them to refrain from constitutionally accepted speech. *Id.* at 392–93; *see also Sec'y of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956–57 (1984).

. [so] plaintiffs ha[d] alleged an actual and well-founded fear that the law [would] be enforced against them." *Id.* at 392–93.

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Court yet again found that a pre-enforcement challenge was justiciable. There, the plaintiffs challenged a statute that criminalized "knowingly provid[ing] material support or resources to a foreign terrorist organization." *Id.* at 8. The plaintiffs alleged past support and an intent to continue supporting designated terrorist organizations in the future.

The Court held that the plaintiffs had standing because: (1) the provision of support was arguably protected speech; (2) the support the plaintiffs planned to provide would violate the statute; and (3) the Government had prosecuted 150 persons under the statute and declined to disavow future prosecution of the plaintiffs if they resumed their support. *Id.* at 15–16.

Finally, in *Susan B. Anthony List*, the Court found standing once more. 573 U.S. at 161. There, an anti-abortion organization challenged a statute that prohibited "false statements [made] during the course of a political campaign." *Id.* at 152. The Ohio Elections Commission ("**OEC**") found probable cause to investigate the petitioners for falsely stating that a congressmember had voted for "taxpayer-funded abortion." *Id.* at 162. However, the OEC never reached a final determination on the merits—and, therefore, never enforced the statute against

the petitioners. *Id.*[6] Nonetheless, the petitioners challenged the statute's constitutionality because they planned to make similar false statements in future election cycles. *Id.* at 155.

The Court found standing because: (1) "the petitioners' intended future conduct concern[ed] political speech, [which] is certainly 'affected with a constitutional interest'"; (2) the statute swept broadly enough to cover the petitioners' false statements about taxpayer-funded abortion; and (3) the threat of future enforcement was "obviously" substantial because the petitioners had already been the subject of an OEC complaint for similar conduct. *Id.* at 161–64.

Having outlined the relevant analysis, this Court now returns to the case at hand. Here, Plaintiffs fail to satisfy the three-part standard laid out in *Susan B. Anthony List*. In particular, they do not allege any intended conduct that is "arguably proscribed" by the Act. According to Plaintiffs, they engage in peaceful protests and counsel others to do the same. (Doc. 5, ¶ 35). They make no argument that this conduct is proscribed. On the contrary, the Statute explicitly allows for peaceful protests. FLA. STAT. § 870.01(7) ("This section does not prohibit constitutionally protected activity such as a peaceful protest.").

Notwithstanding Plaintiffs' repeated emphasis that they have "no intent to incite a riot or promote force" (Doc. 5, ¶¶ 34, 36, 39, 40, 53), they argue that the Act "threatens to impose liability . . . regardless of their intent to incite violence"

---

[6] The congressmember targeted by the petitioners lost his election and withdrew his complaint. *Id.*

10

(*Id.* ¶ 21). This is not a reasonable interpretation of the Statute. Section 870.01(2) explains that "[a] person commits a riot if he or she *willfully* participates in a *violent* public disturbance involving an assembly of three or more persons, acting with a *common intent* to assist each other in violent and disorderly conduct." FLA. STAT. § 870.01(2) (emphasis added). Likewise, "[a] person commits inciting a riot if he or she *willfully* incites another person to participate in a riot, resulting in a riot or imminent danger of a riot." *Id.* § 870.01(4) (emphasis added).

Although "[n]othing in [the Supreme Court's] decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law," he must identify conduct that could at least *arguably* violate the law. *Susan B. Anthony List*, 573 U.S. at 163; *see, e.g.*, *American Booksellers*, 484 U.S. at 390–91 ("The booksellers . . . testified that the law might apply to as much as one half of their inventory."). In this case, Plaintiffs' persistent disavowal of an intent to cause violence prevents them from falling within the ambit of a Statute with an express intent requirement.[7] Therefore, they have not identified any protected conduct or speech that is arguably proscribed by the Statute.

The flaw in Plaintiffs' reasoning is subtle—they do not argue that the Statute itself improperly penalizes protected speech, but that the Statute will be

---

[7] The *Susan B. Anthony List* petitioners also disavowed an intent to violate the statute, but that case is distinguishable. The petitioners insisted that their anti-abortion statements were truthful, but the Court explained that their subjective beliefs were irrelevant to whether the statements were *arguably* untrue—and therefore *arguably* proscribed by the statute. This line of reasoning is inapposite here. Plaintiffs' subjective intent is the whole ball of wax. Conduct is either intentional or it is not.

improperly *applied* to penalize protected speech. They argue that the Statute "increases opportunities for selective enforcement and selective prosecution based on hostility toward unpopular views, like Black Lives Matter." (Doc. 41, p. 18). The Court agrees that this outcome is possible—if not probable.[8] But the potential for viewpoint-based application of a facially neutral law cannot be litigated *ex ante*. Selective enforcement against disfavored speakers "would of course be unconstitutional, but [the Supreme Court] think[s] that this abuse must be dealt with if and when a pattern of unlawful favoritism appears." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

In sum, the Amended Complaint does not allege a credible threat of prosecution for "encouraging and advising peaceful demonstrations." (Doc. 5, ¶ 42). Therefore, Plaintiffs have not alleged an objectively reasonable fear that the Statute will be enforced against them. Their subjective chill is "insufficient to sustain the burden that Article III imposes." *Wilson*, 132 F.3d at 1428.[9]

---

[8] *Cf.* Li Zhou & Kainaz Amaria, *These Photos Capture the Stark Contrast in Police Response to the George Floyd Protests and the Anti-Lockdown Protests*, VOX (May 27, 2020), https://www.vox.com/2020/5/27/21271811/george-floyd-protests-minneapolis-lockdown-protests.

[9] The Court also notes that Plaintiffs do not actually allege that their speech has in fact been chilled. They allege that they "organized, encouraged, and funded peaceful demonstrations and expressions of free speech set to take place on April 24th, 2021 [*i.e.*, before filing the Amended Complaint]. Furthermore, Plaintiffs plan to organize, encourage and fund future demonstrations, specifically a demonstration planned on May 15th, 2021." (Doc. 5, ¶ 61). There are no allegations that either demonstration was canceled, changed, or otherwise chilled due to fear of prosecution.

As a final note, the Court pauses to emphasize that its holding is limited to the extremely narrow issue of whether *these particular Plaintiffs* have standing to sue in *this particular case*. The Statute could very well be applied in an unconstitutional manner and have an unconstitutional chilling effect on speech. Indeed, it seems clear to the Court that Defendants would consider the suppression of anti-police brutality protests—violent or otherwise—a feature, not a bug.[10] [11] Nonetheless, federal courts do not sit as super-legislatures with the power to invalidate reckless and partisan policies. Rather, we resolve cases or controversies, and Plaintiffs here have not presented one.

## IV.    Conclusion

For these reasons, Defendants' Motions to Dismiss (Docs. 25, 32, 33) are **GRANTED**. Plaintiffs' Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

**DONE AND ORDERED** in Orlando, Florida on August 20, 2021.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

---

[10]   Governor DeSantis explicitly characterized the Statute as "pro-law enforcement." Paul LeBlanc, *Florida Governor Signs Controversial 'Pro-Law Enforcement' Law Cracking Down on Riots*, CNN (Apr. 19, 2021), https://www.cnn.com/2021/04/19/politics/ron-desantis-signs-combating-public-disorder-act/index.html.

[11]   On the other hand, it is also possible that the Statute's passage was merely political theater with no practical consequences beyond virtue-signaling to Defendants' base voters. As Plaintiffs note, "the conduct barred by the [Statute] is already proscribed by laws currently on the books of the [S]tate of Florida." (Doc. 5, ¶ 42).